FILED
October 15, 2026
Jeanne A. Naughton, CLERK
United States Bankruptcy Court
Newark, NJ
By: Juan Filgueiras, Courtroom Deputy

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

In Re:

Technical Arts Group LLC,

Debtor.

Case No.: 25-22241 (VFP)

Chapter: 11

Technical Arts Group LLC,

Plaintiff,

v.

Abe V. Systems Inc,

Defendant.

Adv. Pro. No.: 25-2482 (VFP); 25-2483(VFP) (Consolidated)

Judge: Vincent F. Papalia

**OPINION GRANTING DEBTOR'S MOTION FOR DIRECTED VERDICT PURSUANT TO FEDERAL RULE OF BANKRUPTY PROCEDURE 7052**

APPEARANCES

**TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.**
Richard Trenk, Esq.
Robert Roglieri, Esq.
Stephen Gengaro, Esq.
290 W. Mt. Pleasant Ave, Suite 2370
Livingston, New Jersey 07039

*Counsel to Plaintiff*

**PORZIO, BROMBERG & NEWMAN, P.C.**
Warren Martin, Esq.
Christopher Mazza, Esq.
Kimberly Pageau, Esq.
5 Sylvan Way, Suite 110
Parsippany, NJ 07054

*Counsel to Defendant*

**Vincent F. Papalia**
**United States Bankruptcy Judge**

This matter is before the Court on the motion of Technical Arts Group LLC ("TAG" or the "Debtor"), the plaintiff in this adversary proceeding and the debtor in this case, for a directed verdict pursuant to Federal Rule of Civil Procedure 52(c), made applicable in bankruptcy through Federal Rule of Bankruptcy Procedure 7052, on a narrow issue: whether the UCC Article 9 sale conducted by defendant Abe V. Systems, Inc. ("AVS" or "Defendant") was commercially reasonable. For the reasons that follow, the Court finds that it was not.

## I. JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court for the District of New Jersey on July 23, 1984, and amended on September 18, 2012 (Standing Order 12-1), and further amended on June 6, 2025 (Standing Order 2025-2). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this Court under 28 U.S.C. § 1408. The Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## II. INTRODUCTION

As noted, the issue before the Court is whether the UCC (as defined below) auction sale conducted by AVS on November 19, 2024 (the "Auction Sale" or the "Sale") was commercially reasonable under N.J.S.A. § 12A:9-610. The undisputed facts are that the Sale of AVS's Collateral (as defined below) was conducted by a group of experienced professionals with

specialization in the auction sale process generally and in the sale of audio-visual equipment in particular. Also undisputed is that the Sale was widely marketed to an appropriately targeted market of potential bidders over a period exceeding forty days. Similarly undisputed is the fact that TAG did not cooperate with AVS in arranging or allowing the Sale. Those are the principal facts on which AVS bases its argument -- as to which it bears the burden of proof -- that the Sale was commercially reasonable "under the circumstances." Also undisputed are the following facts:

- neither the auctioneer nor the potential bidders had access to the collateral that was the subject of the Sale (the "Collateral") for purposes of inspection, removal or otherwise.
- there was no certainty as to the condition, location or existence of the individual items of Collateral.
- the list of the Collateral being sold was outdated (by about a year) and inaccurate.
- neither AVS nor its agents could provide any assurances as to the ability of potential bidders to access and remove any Collateral they purchased.

As a result, potential bidders did not know what equipment they were bidding on, what condition it was in, whether it existed, where it was located or whether they would be able to retrieve it if they were a successful bidder. In other words – or more accurately in the words of AVS's own expert – this was a "blind" auction which he analogized to "buying a pig in a poke." [1] He further testified that he "wouldn't buy it blind," *i.e.*, the property being auctioned, if he were a bidder. *Transcript of May 15 hearing*[2] ("T5") at 181:4-182:2. In this Court's view, a "blind" auction in which AVS's own expert would not participate and which he likened to "buying a pig in a poke" is, by definition, not a commercially reasonable one. Accordingly, for these reasons

---

[1] "A *pig in a poke* is a thing that is bought without first being inspected, and thus of unknown authenticity or quality." Oxford English Dictionary, 3rd Edition, 2006.
[2] Dkt. No. 37

and the additional ones discussed in more detail below, this Court finds the Sale conducted by AVS was not commercially reasonable and is void.

## III. PROCEDURAL HISTORY

TAG filed a voluntary petition under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") on November 18, 2025. Two days later, TAG filed a Notice of Removal removing the pending state court litigation captioned *Technical Arts Group LLC, et al. v. Abe V. Systems and Abraham Viera Jr.,* Docket No. BER-C-218-24 (the "Removed Action") to this Court. The complaint in the Removed Action seeks, *inter alia.*, a declaration that the auction and sale of certain equipment and inventory collateral was illegal and of no legal effect. Specifically, Count Two asserts that the auction sale was not commercially reasonable in violation of N.J.S.A. § 12A:9-610. As a result, TAG asserts that it is entitled to recover any losses attributable to the allegedly improper sale, in addition to the statutory penalties set forth in N.J.S.A. § 12A:9-625.

On the same day it filed the Notice of Removal, TAG also filed a complaint commencing a separate adversary proceeding against AVS alleging that the Auction Sale was a fraudulent transfer pursuant to 11 U.S.C. § 548 ("Adversary Proceeding"). By Stipulation and Consent Order entered February 9, 2026, the parties also agreed that the Removed Action and the Adversary Proceeding would be administratively consolidated for trial purposes. The parties agreed that AVS would proceed first with its case on the limited issue of the commercial reasonableness of the Sale, as to which AVS bore the burden of proof. Dkt. No. 39 at ¶ 87. AVS commenced its case on that issue on March 9 and concluded on July 7, 2026.[3]

[3] Trial dates were March 9, 11, 12, 13, May 15, 18, June 8, 22 and July 7. The parties thereafter submitted post-trial briefs, with oral argument conducted on August 4, 2026.

## IV. FINDINGS OF FACT

TAG is a limited liability company whose members originally consisted of KM Productions NY, Inc. ("KMP"), Quality Audio and Visual Inc. ("QAV"), and AVS (collectively the "Founding Members"). Dkt. No. 32-1 at 2. Differences arose among the Founding Members relatively quickly, particularly between the owners of TAG, including Mr. Mignone, and Abraham Viera, Jr. ("Viera Jr."), one of the owners of AVS. *Id*. Ultimately, the owners of TAG concluded that the partnership was no longer workable, and the parties entered into a series of agreements to allow TAG to buy AVS out of TAG. *Id*. at 3.

To effectuate TAG's purchase of AVS's membership interests in TAG and equipment assets owned by AVS, the Founding Members entered into a series of agreements including:

- Withdrawal, Redemption and Release Agreement ("Withdrawal Agreement") whereby, among other things, TAG repurchased AVS's membership interests for $415,000, which payment was made to AVS.

- Asset Purchase Agreement ("APA") whereby TAG (i) purchased certain rental inventory; and (ii) paid and fully satisfied certain equipment finance obligations and an SBA loan held in AVS's name. The aggregate purchase price for these items was $2,839,314.64 to be paid under the Secured Note (defined below) to AVS.

- Secured Promissory Note ("Secured Note") in the amount of $2,839,314.64 made by TAG in favor of AVS to secure the purchase price under the APA, due on July 2, 2024.

- Security Agreement ("Security Agreement") to secure the Secured Note with the specified collateral. The Security Agreement identifies the collateral that secures the Secured Note and includes all after-acquired inventory and its proceeds. This collateral was listed on Schedule 3 to the Security Agreement.

- Bridge Guaranty, whereby KMP and QAV guaranteed the Secured Note.

*Id*.

On July 1, 2024, TAG and AVS began discussions concerning an extension of the Secured Note's maturity date. *See* J-7. On July 22, 2024, the parties entered into a Forbearance Agreement whereby the Debtor would pay $2,839,314.64 on August 22, 2024, plus $100,000 in

interest, forbearance fees, legal fees and expenses. *See* J-8. TAG failed to perform its obligations under the Forbearance Agreement and an Event of Default was declared under the Secured Note. *See* J-9.

On September 6, 2024, AVS issued a Notification of Disposition of Collateral ("First Notification"). The First Notification described the Collateral as follows:

> The Purchased Assets (as defined in that certain Asset Purchase Agreement, dated as of January 2, 2024, between Debtor and Secured Party all Goods, Inventory, Equipment and Fixtures; all Proceeds of each of the foregoing; and to the extent not otherwise included, substitutions, replacements, accessions, products and other Proceeds (including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any or all of the foregoing.

J-10**.** At that point, no auctioneer had been retained. The Purchased Assets, as defined in the APA, included some 80,000 pieces of equipment or "gear" that were identified on a list posted in the data room relating to the proposed Sale. *See* J-1 (this collateral was listed on Schedule 3 to the Security Agreement and was previously defined as the "Collateral").

The First Notification, which was apparently not sent to the secured creditors, scheduled the sale of the Collateral to the highest bidder at an auction to be held at the offices of Paul Hastings, AVS's law firm, on October 16, 2024. On October 9, 2024, AVS issued a Notification of Postponed Disposition of Collateral ("Second Notification"). The Second Notification contained the same description of the Collateral as in the First Notification. The Second Notification moved the date of the Auction to November 12, 2024. The Second Notification was also sent to creditors who held secured positions in the Collateral. *See* J-17. No payoff information was provided regarding the third party secured debt.

TAG did not cooperate with AVS's repeated efforts to exercise its contractual rights to obtain information to prepare for the auction process or obtain access to the Collateral. *See*

*Transcript of March 12 hearing*[4] ("T3") at 100:10–11 ("Q. Was TAG cooperating in the auction sale? A. (Monroe) No, they were not cooperating."). The Debtor refused all of AVS's requests for an updated, detailed list of all Collateral and liens against it and requests to provide access to the Collateral. That access was obviously important to bidders for multiple reasons, including the Collateral's status, its existence and the ability to retrieve it. Additionally, at trial, AVS's counsel agreed with Debtor's counsel that the updated Collateral list and the liens against it would have provided "vital information to have available to AVS as a secured creditor and to the public if they're going to bid." *See Transcript of March 11 hearing*[5] ("T2") at 33:4–5.

TAG failed to respond to all of AVS's requests for information or requests to allow access to the Collateral prior to the Sale. *See Transcript of March 9 Hearing*[6] ("T1") at 108:14–112:1. Specifically, on September 10, 2024, AVS's counsel sent TAG a letter demanding information, including: (i) an updated list of all Collateral; (ii) copies of assignments and documents evidencing the security interest; (iii) an updated list of the location of all Collateral; and (iv) a detailed list of all liens and encumbrances the Debtors had granted on the Collateral. *See* AVS-13; *see also* T1 at 107:1–108:15. AVS sent additional letters on October 16, 2024, and November 5, 2024, reiterating these demands and also requesting that the Debtor grant AVS, the auctioneer, and qualified bidders access to inspect the Collateral. *See* AVS-13, AVS-18, AVS-24. It is undisputed that TAG failed to cooperate with or even respond to any of these requests. Nonetheless, settlement negotiations continued between September and November 2024.

When negotiations between TAG and AVS broke down, AVS moved forward with its plans to auction the Collateral. AVS retained Paul Hastings, an international law firm with

---

[4] Dkt No. 26
[5] Dkt No. 25
[6] Dkt No. 24

experience in UCC sales, and an experienced auctioneer, Joseph Finn Co., Inc. ("Finn") to conduct the Auction Sale. The Auction Sale was widely publicized via over 9,300 emails sent to industry-specific recipients, banner advertisements on three major industry websites generating more than 120,000 impressions, and a populated virtual data room. *See* Dkt. No. 39 at 7.

One of the terms of the Auction Sale was that all bidders (besides AVS) were required to provide a 5% deposit which capped their bids at a maximum bid of 20 times the deposit. *See* J-26. Only AVS was privy to the amount of the other bidders' deposits prior to the start of the auction. *See* J-30; J-31.

Over eighty parties expressed at least initial potential interest, with seventy-four executing non-disclosure agreements, and five bidders providing deposits, including one bidder (NEP/Bonnano) who deposited $200,000, enabling a maximum bid at the Sale of $4 million. Bidding was to begin with $50,000 minimum increments. *See* J-32. Only two bidders other than AVS engaged in bidding at the auction (NEP/Bonnano did not bid). The two other bidders in the auction stopped bidding at their cap and the auctioneer never announced any ability to exceed the caps. *See* J-32. The Sale culminated in a winning bid by AVS of $2,550,000, which was $50,000 over the next best capped bid. Of that amount, $1,376,321.83 was a credit bid by AVS.

## V. CONCLUSIONS OF LAW

### A. <u>Directed Verdict on Partial Findings</u>

Federal Rule of Bankruptcy Procedure 7052, which incorporates Federal Rule of Civil Procedure 52, applies in nonjury trials and allows the court to enter judgment on a specific issue within a case. *Stempel v. Unum Life Insurance Co.*, 2026 WL 2241244, at *2 (N.D. Ill. Aug. 4, 2026). The Rule provides:

> (c) Judgment on Partial Findings. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the

> court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c). The Rule's objective is to “conserve[ ] time and resources by making it unnecessary for the court to hear evidence on additional facts when the result would not be different even if those additional facts were established.” 9 James Wm. Moore et al., Moore's Federal Practice, § 52.50 [2] (3d ed. 2010). As noted by the First Circuit Court of Appeals, “[w]hen a party has finished presenting evidence [as to a particular issue] and that evidence is deemed by the trier insufficient to sustain the party's position, the court need not waste time, but, rather, may call a halt to the proceedings and enter judgment accordingly.” *Feliciano v. Rullan*, 378 F.3d 42, 59 (1st Cir. 2004).

Thus, a court may grant a Rule 52(c) motion made by either party or may grant judgment *sua sponte* at any time during a bench trial, so long as the party against whom judgment is to be rendered has been “fully heard” with respect to an issue essential to that party's case. *EBC, Inc. v. Clark Bldg. Sys., Inc*., 618 F.3d 253, 272–73 (3d Cir. 2010). As a result, a court need not wait until that party rests its case-in-chief to enter judgment pursuant to Rule 52(c). *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 246 n. 6 (3d Cir. 2007) (“[T]he Federal Rules of Civil Procedure ... allow judgment after partial findings against a party that has been fully heard on the relevant issue.”). Of course, the court may opt to reserve judgment until all the evidence is in or until the close of the non-movant's case-in-chief. *Int'l Union of Operating Eng'rs, Local Union 103 v. Ind. Constr. Corp*., 13 F.3d 253, 257 (7th Cir. 1994) (“[I]t is within the trial court's sound discretion to decline rendering judgment until hearing all of the evidence.”).

In considering whether to grant judgment under Rule 52(c), the court applies the same standard of proof and weighs the evidence as it would at the conclusion of trial. *EBC,*618 F.3d at 272–73 (3d Cir. 2010); *Pinkston v. Madry*, 440 F.3d 879, 890 (7th Cir. 2006) (When ruling on a Rule 52(c) motion, a trial court acts as "a finder of fact, weighing evidence and assessing the credibility of the witnesses."). Accordingly, "the court does not view the evidence through a particular lens or draw inferences favorable to either party."[7] *EBC*, 618 F.3d at 272*; see also Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006).

In this matter, although TAG filed its Rule 52(c) motion prior to AVS concluding its presentation of evidence on the commercial reasonableness issue, AVS confirmed during oral argument on the Motion that it has now rested its case. In response to the Court's repeated inquiries at oral argument, AVS was unable to specify additional facts that might be necessary for the Court to make its determination regarding commercial reasonableness. Accordingly, the Court finds that this matter is ripe for determination under Rule 52(c).

**B. <u>Commercial Reasonableness Standard</u>**

The parties do not dispute that the disposition of the Collateral pursuant to the Sale was governed by Article 9 of the Uniform Commercial Code ("UCC"). Further, the parties do not dispute that the applicable sections of the UCC as adopted by New York and New Jersey are substantially identical so there is no choice of law issue. In this Opinion, the Court will use the

[7] At oral argument on the Motion, counsel for TAG stated that on a Rule 52(c) motion this Court must make all favorable inferences in support of the non-moving party. That is not, however, the law in the Third Circuit or in general as to non-jury trials (although that is true for a motion for a judgment as a matter of law in a jury trial). Under Rule 50(a), if a motion is made before submission of the matter to the jury the judge must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *In re Michaels*, 2026 WL 1018575, at *8 (B.A.P 10th Cir. Apr. 15, 2026).

New Jersey version of the UCC. New Jersey statute 12A:9-610 governs the disposition of collateral after a default and provides:

> (a) Disposition after default. After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.
>
> (b) Commercially reasonable disposition. *Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable.* If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

N.J.S.A. § 12A:9-610 (emphasis supplied). As was acknowledged by the parties, the secured party bears the burden of proving the reasonableness of any disposition by considering the "totality of the circumstances." N.J.S.A. § 9:627(a); *Caterpillar Fin. Servs. Corp. v. Wells*, 278 N.J. Super. 481, 511 (Law. Div. 1994). Accordingly, in *Security Savings Bank v. Tranchitella*, 249 N.J. Super. 234 (App. Div. 1991), the Appellate Division considered the "totality of the circumstances" in analyzing the commercial reasonableness issue, including "the specific nature of the collateral, depreciated value, special markets, the amount and type of advertising done, the length of time which elapsed between repossession and resale, necessity for appraisal, public versus private sale, notice, price and normal commercial practices employed by the trade." *Id.* at 239-40; *see also In CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*, 717 F. Supp. 3d 331, 336 (S.D.N.Y. 2024) ("The commercial reasonableness test analyzes the totality of the circumstances, including the good faith efforts of the creditor.") (cleaned up).

As to the "price" factor, the Court notes that while a price less than the value of the collateral being sold is not determinative of the commercial reasonableness issue, it certainly is a factor the Court can and should consider. *Tranchitella*, 249 N.J. Super. at 243. There, the court found that the secured party has "the obligation to make a good faith effort to obtain the highest

possible price for the [item].” *Id.* Further, a “substantial difference between the price received and the [item’s] fair market value is relevant in deciding whether the sale was commercially reasonable.” Dkt. No. 32-2, Ex. A (Model Jury Charge 4.44 at 4 citing *Mercantile Financial Corp. v. Miller*, 292 F. Supp. 797 (E.D. Pa. 1968)).

Additionally, New Jersey statute 12A:9-609 outlines a secured party's right to take possession after default and provides:

> (a) Possession; rendering equipment unusable; disposition on debtor's premises. After default, a secured party:
> (1) may take possession of the collateral; and
> (2) without removal, may render equipment unusable and dispose of collateral on a debtor's premises under 12A:9-610.
>
> (b) Judicial and nonjudicial process. A secured party may proceed under subsection (a):
> (1) pursuant to judicial process; or
> (2) without judicial process, if it proceeds without breach of the peace.
>
> (c) Assembly of collateral**. If so agreed, and in any event after default**, a secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties.

N.J.S.A. § 12A:9-609 (emphasis supplied).

**C. Whether the Sale Was Commercially Reasonable**

The Court agrees with AVS that the legal standard applicable to Article 9 sales is commercial reasonableness and not commercial perfection. The Sale at issue here was not perfect, but the question for the Court is whether AVS nonetheless sustained its burden of establishing that it was commercially reasonable as that concept is applied in the UCC. To make that determination, the Court will examine each aspect of the Sale, as well as the totality of the circumstances.

**1) <u>Timing</u>**

AVS provided over 70 days of advance notice to TAG which far exceeds the ten-day minimum required by section 12A:9-612. This was reasonable.

**2) <u>Marketing</u>**

The marketing undertaken by AVS's auctioneer was extensive and correctly targeted and was more than satisfactory in the circumstances.

**3) <u>Notice</u>**

The New Jersey Appellate Division has held that a notice of a UCC sale must "sufficiently describe the collateral to be sold so as to allow potential bidders the opportunity to make an informed decision." *Tranchitella*, 249 N.J. Super. at 241. In this case, the notices sent to potential bidders did not sufficiently describe the Collateral, and it could not, because AVS and its auctioneer were denied access to the Collateral and were not provided with an updated Collateral list. The Collateral list that was placed in the data room[8]– which was the only list available to potentially interested parties – was dated December 28, 2023, almost a year before the Auction. It is undisputed that this list was materially inaccurate and incomplete. *See* Dkt. No. 39 at 10; *Transcript of July 7 hearing*[9] ("T9") at 35:25-36:2. The Court agrees that the Collateral list that was provided to potential bidders in the data room was outdated, inaccurate, and incomplete.

The stale Collateral list was acutely problematic in this case for several reasons. First, TAG is (and was then) operating a business in which equipment is constantly being taken in and out of the warehouse and at any given moment could be out on a job site. Also, because the

[8] J-1
[9] Dkt. No. 41

equipment was in regular use, it was subject to wear and tear. Therefore, the stale list could not account for items that were out in the field, were no longer working (or were otherwise in disrepair), or had been replaced. Additionally, of the approximately 80,000 pieces of equipment on the list some had no description or value assigned and others had limited or unintelligible descriptions. Thus, parties were unable to determine exactly what equipment they were bidding on, what any assigned values meant, the equipment's condition, or even its existence.

In the *Tranchitella* case, the Appellate Division found that the description of the subject collateral as a "1986 Chevrolet Truck" was insufficient as that description could describe "anything from a small pick-up truck to a tractor-trailer." 249 N.J. Super. at 242. Here, the description of the Collateral was at least as insufficient and inadequate. For example, one of the items of Collateral on the list was simply described as "Tuck's workbox."[10] Such insufficient notice and description, in this Court's view, contributed materially to the commercial unreasonableness of the Auction Sale.

**4) <u>Price</u>**

Three bidders engaged in bidding at the Sale which culminated in AVS making the winning bid of $2,550,000. Although a determination of a precise value for the Collateral is not directly before the Court on this Motion, and the Court is not making any final determination as to value, the evidence in the record strongly suggests that the price obtained at the Sale was inadequate, as it was significantly below the Collateral's fair market value (as determined by AVS's expert) and even the values assigned to it by AVS's principal, Mr. Viera. Under the Secured Note, TAG and AVS stipulated that the original purchase price of the Collateral was over

[10] At trial, Viera Jr. explained: "That was a personal guy's workbox. That was an employee. We called him Tuck. And he just had a workbox with personal effects in it." T9 at 49:12-15.

$19.6 million. *See* J-1; J-3. But that valuation was perhaps made for other purposes and is not being given any weight by the Court here. However, both AVS and its own valuation expert testified that the Collateral's fair market value was more than $9 million. *See* T8 at 23:23–24:7. Even at the "auction depreciation value" that was "made up" by AVS's expert, the value was more than $4 million – or about $2 million more than the winning bid. *See Transcript of March 13 hearing*[11] ("T4") at 56:15-21.

Perhaps most significantly, one of AVS's owners, Viera Jr., testified that the Collateral was worth many millions more than the winning bid. The following testimony was elicited on cross-examination:

> Trenk: So you testified during the last hearing quite clearly that your estimate of the value of the gear that you were supposedly the winning bidder on November 19, 2024, was approximately $10 million. Do you remember that testimony?
>
> Viera, Jr.: Sure.
>
> Trenk: Okay. Again, when you use the word sure, you're answering --
>
> Viera, Jr.: Yes.

*Transcript of June 22 hearing*[12] ("T8") at 23:23 -24:5. Additionally, shortly after the Sale, AVS offered to sell the Collateral back to TAG for approximately $7 million. *See* T3 at 57:2-59:23.

The Court also agrees with AVS's contention that "it is improper to reason backwards from price alone to determine the commercial reasonableness of the overall sale process." *Hicklin v. Onyx Acceptance Corp.*, 970 A.2d 244, 251 (Del. 2009). But that is not the same as saying that price is irrelevant. An exceptionally low price can be probative of the reasonableness of the auction process. *Mercantile Fin. Corp. v. Miller*, 292 F. Supp. 797, 801 (E.D. Pa. 1968) (a

---

[11] Dkt. No. 27

[12] Dkt No. 40

price "discrepancy, if substantial, is relevant to a determination of whether a challenged sale was 'commercially reasonable'"). The price discrepancy was substantial here.

In *Tranchitella*, a truck purchased for $21,600 was repossessed and sold by the secured creditor about a year later through a private sale for $14,500. 249 N.J. Super. at 236-237. Even though the secured creditor provided some evidence that the truck was worth only $10,000, the court found that the secured creditor failed to use commercially reasonable, good-faith efforts to obtain "the highest possible price for the truck, specifically considering the price as a factor." *Id.* at 243. Here, the price obtained at the Auction Sale was anywhere from approximately $2 million to $7 million less than the value placed on the Collateral by ANS's principal and its expert. [13] While not dispositive, that differential is further evidence of the commercial unreasonableness of the Auction Sale.

At oral argument, AVS's counsel argued that if a low price was obtained at the Sale that was not a problem because the only party potentially hurt was TAG and that this Court should not take a "bankruptcy view" and consider the interests of all parties.[14] The Court disagrees because the UCC itself imposes a duty to act in good faith. *See* N.J.S.A. § 12A:1-304 ("Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."). New Jersey courts have interpreted that duty to mean that in a

---

[13] The smaller difference of about $2 million is based on the "auction depreciation value" that was "made up" by AVS's expert and is not being adopted by this Court.

[14] Similarly, in its opposition brief AVS stated: "Where the Debtor is the only party who suffers from the circumstances it created, it should not be heard to throw those alleged deficiencies at the feet of the defendant." *AVS brief* at 3. While TAG may be the blameworthy party as to lack of cooperation, TAG's noncooperation does not alter this Court's obligation to determine if a commercially reasonable disposition of Collateral occurred here based on the totality of the circumstances. Those circumstances include, among other things, TAG's lack of cooperation and AVS's failure to avail itself of available judicial remedies when the non-cooperation became apparent.

UCC sale, a secured party "has a good faith obligation to secure the highest net benefit **for the debtor**." *Tranchitella*, 249 N.J. Super. at 242, n. 2 (emphasis supplied). In other words, the secured party has "the obligation to make a good faith effort to obtain the highest possible price for the item" for the benefit of other parties, including the debtor. *Id.* at 243.[15] Thus, the interests of the Debtor and other parties are to be considered by this Court in determining commercial reasonableness.

In this case, the Auction Sale did not secure the highest net benefit for the Debtor (or other interested parties), nor did it satisfy AVS's obligation to obtain the highest possible price for the Collateral.

**D. <u>Totality of the Circumstances</u>**

As previously established, both New Jersey and New York courts look at the totality of the circumstances in evaluating commercial reasonableness. *Tranchitella*, 249 N.J. Super. 239-40; *In CCO Condo*, 717 F. Supp. 3d at 336. AVS maintains that it has "affirmatively established by a preponderance of the evidence that the November 19, 2024 UCC Sale was commercially reasonable and generated reasonably equivalent value **under the circumstances.**" *AVS brief* at 3 (emphasis supplied).[16] What has not been affirmatively established is that "under the circumstances" and the "totality of the circumstances" are co-extensive. This distinction is not academic. It is vitally important in this case because even AVS's auction expert, Mr. Ronald Caspert, rendered his conclusion that the Sale was commercially reasonable with the caveat "under the circumstances." T5 at 184:4-8 ("Q: Under the circumstances of this particular auction that were present, that we've talked about ad nauseum today, did Ross Finn run a commercially

---

[15] These duties of a secured party to a debtor (and others) also directly conflict with AVS's argument that any such duty was abrogated by the Debtor's failure to cooperate.
[16] Dkt. No. 39

reasonable auction, in your opinion? A: Yes, he did."); T5 at 180:17-22 (Q: I think a reasonable inference is that you run commercially reasonable auctions. Is your understanding that under -- the circumstances adapt to – commercial reasonableness adapts to the circumstances of the auction? … A: Correct.").

The "circumstances" being relied upon by AVS are the deficiencies with the Auction Sale that were caused or materially exacerbated by TAG's own alleged misconduct. The Court uses the word "alleged" here because the parties vigorously dispute whether TAG had a duty to assemble the Collateral for the Sale and allow access for inspection and other purposes. The Court finds that no provision of the Security Agreement required TAG to assemble or provide access to the Collateral, although providing access was at least arguably TAG's duty under the UCC after it defaulted. *See* N.J.S.A. § 12A:9-609(c). Also, the Security Agreement did require TAG to provide an updated lien list and other updated information, which TAG did not do. However, these failures are largely academic as there is no dispute that TAG did not provide any access or information whether or not it was required by the Security Agreement or the UCC. The question for this Court to decide is whether the Sale was commercially reasonable in light of that non-cooperation. For the reasons previously stated and those that follow, the Court answers the question in the negative.

AVS's understanding of "under the circumstances" appears to be that when a debtor creates obstacles to a UCC sale a creditor is justified in conducting an objectively ***unreasonable*** sale. This understanding was essentially confirmed by AVS's own expert when he testified that he had never conducted an auction sale like this one, that the lack of information and access materially and adversely affected the entire process, including the price obtained, and that bidding at the Auction Sale was "like buying a pig in a poke." The UCC contains no "difficult

debtor" exception to the commercial reasonableness standard. The Court is not willing to read such a significant exception into the statute without any legislative or caselaw support. AVS has cited no authority to support its position that commercially unreasonable sales are permissible under the UCC if a debtor is noncooperative. As noted by TAG, the UCC (and the law generally) provides a secured party with the ability to seek judicial remedies if a debtor is uncooperative. In this regard, the UCC expressly provides that the secured party may seek appropriate relief through "judicial process." N.J.S.A. § 12A:9-609(b).

In this case, although AVS appears to have at least considered that option, it chose instead to proceed with a Sale that was littered with the material deficiencies noted in this Opinion. If AVS had gone to court, it could have asked for and likely secured access to the Collateral and the information it was requesting. It also could have asked a court to conduct a judicially authorized and/or supervised sale that would likely have provided it with the *BFP* protection it seeks in this case.[17] *See* N.J.S.A. § 12A:9-627(c)(1) (a disposition of collateral "is commercially reasonable if it has been approved [ ] in a judicial proceeding"); *and BFP v. Resolution Trust Corporation*, 511 U.S. 531, 545 (1994) (consideration received in a non-collusive, **regularly conducted** non-judicial foreclosure sale constitutes reasonably equivalent value). Instead, it chose not to do so and proceeded with the Sale. In the Court's view, that failure to seek judicial relief, particularly in these circumstances, was itself commercially unreasonable.

The phrase "commercially reasonable" is peppered throughout the UCC but nowhere in the UCC does it indicate that it is a subjective "under the circumstances" test. Although neither the parties' nor the Court's own research disclosed a case that directly addresses that issue in

[17] AVS moved to dismiss TAG's complaint on various grounds, including AVS's asserted compliance with the *BFP* standard. [Dkt. No. 8]. That motion was denied by this Court. [Dkt. No. 14]. AVS also cited to *BFP* extensively in its post-trial briefing. [Dkt. No. 39 at 37-40].

relation to section 9-610(b), there are some that interpret the phrase in other parts of the UCC. In a case addressing the question of who should bear the risk of loss due to a fraudulent wire transfer, the bank defended by arguing that its actions were commercially reasonable. The District Court held that: "As set out in the UCC as adopted by Mississippi, the determination of what is commercially reasonable is a question of law—which the Court believes imposes an objective test of reasonableness." *Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 2013 WL 1121339, at *6 (W.D. Mo. Mar. 18, 2013)*, aff'd*, 754 F.3d 611 (8th Cir. 2014). This Court agrees with that analysis, particularly in this case where sophisticated parties were represented by experienced counsel; the non-cooperation was material and continuing; and the entire Sale process was adversely affected as a result. AVS could and should have gone to court in these circumstances.

Accordingly, the Court finds that considering the totality of the circumstances in evaluating commercial reasonableness is not the same as creating a subjective "under the circumstances" standard for commercial reasonableness. Such a subjective test would essentially eliminate the commercial reasonableness standard whenever a debtor does not cooperate with an involuntary sale of collateral and the Court so holds.

1) **<u>AVS's Decision to Proceed with the Auction Sale</u>**

a. **<u>The Decision to Go Forward with the Sale Rather Than Litigate Was Not Reasonable in the Circumstances.</u>**

As noted, at some point, AVS made the decision to go forward with the Sale even after it was abundantly clear that TAG had no intention of cooperating with the Sale by giving an updated Collateral list, giving the auctioneer and bidders access to inspect the Collateral, or providing a list of payoff amounts for liens. Mr. Mignone made no secret of that, going as far as announcing that "we are not offering him access to any gear nor will we be participating in an[y]

commercially reasonable sale of the inventory." *See* AVS-20. The auctioneer received many inquiries from potentially interested parties as to how the Auction would proceed with this lack of information or certainty and essentially told those parties that AVS had no control over TAG and that potential bidders were on their own in retrieving any Collateral. Many of those inquiries and the auctioneer's responses are highlighted in TAG's moving brief.[18]

Despite these deficiencies, and even though AVS could not give any assurances that bidders could retrieve any Collateral they successfully bid upon, AVS went ahead with what its own expert testified was a "blind" auction in which the bidders had no ability to inspect the Collateral. T2 at 10:23-24. AVS's expert Mr. Ronald Caspert testified that the inability to inspect the Collateral was "[t]he biggest impediment by far" and that it "affected the entire auction, the entire process." *See* T5 at 48:17-23, 170:12-25. Mr. Caspert further testified that the absence of inspection access meant the equipment "**would definitely bring so much less than its value.**" *Id*. (emphasis added). As noted, he also testified that buying items you could not inspect was like "buying a pig in a poke" (T5 at 49:3) which is what made this Sale "wildly different" than the thousands of other similar sales he had conducted. *See* T5 at 137:18-25. Mr. Finn, AVS's auctioneer, who had similarly participated in thousands of other sales of similar equipment, also testified that these were circumstances he had never faced before. *See Transcript of May 18 hearing*[19] ("T6") at 197:24-198:23.

In another case involving the repossession and sale of a vehicle, the court stated that it "interprets the phrase 'every aspect of this disposition' to include not just the sale of the collateral but also the decision to repossess it." *First Fid. Acceptance v. Hutchins*, 315 N.J.

[18] Dkt. No. 32-1 at 10-13
[19] Dkt. No. 34

Super. 201, 204 (Law. Div. 1998). In that case, the court found that it was not commercially reasonable to spend $1,655.33 repossessing and preparing for sale a car that is likely to sell for only $500. That rationale is directly applicable here. AVS had the obligation to ensure that every aspect of the disposition of the Collateral was reasonable, including the decision whether to proceed with the Auction Sale rather than seek judicial intervention. While the UCC may not require AVS to avail itself of the judicial intervention option, the decision to forego that intervention still factors into whether the sale process as a whole can be considered commercially reasonable. That decision is certainly an "aspect of a disposition of collateral" and every aspect must be commercially reasonable. N.J.S.A. § 12A:9-609(b)(2). In this Court's view, the fact that of the 80 parties that initially expressed interest in the Sale, only 5 provided deposits and only 3 (including the secured creditor) actually bid, as well as the low price obtained, are all indicative of the inherently and obviously problematic nature of going forward with a "blind" sale.

AVS's counsel, Sean Monroe, was unable to satisfactorily explain why he and his team at Paul Hastings made the decision to go forward with a "blind" auction as opposed to seeking, for example, an order of replevin so that AVS and its auctioneer would have access to the Collateral prior to the Sale. At best, his testimony was not elucidating about the decision-making process. T3 at 87:13-24 ("the decision was made strategically"; T2 at 94:21 ("I don't recall the details of our legal analysis at that time"). At worst, it exhibited a lack of understanding that various types of judicial process were available prior to a UCC sale. T2 at 91:11-94:12. Here, the Court notes that AVS found it acceptable to place the burden on bidders to use judicial process to retrieve any equipment but was unwilling to utilize judicial process itself. *See, e.g.*, T2 at 10:23-24; 11:6-10 (quoting from J-28) ("[A]nybody who is a successful bidder and takes title to the inventory equipment would then have the obligation of tracking it down and obtaining possession with

whatever legal means you have available to you," and "it's an unfortunate situation but it's the best we can do."). If AVS can require bidders to utilize legal process to obtain the equipment they successfully bid upon, AVS can and should be required to utilize legal process in similar circumstances.

**b. <u>AVS Should Have Utilized Judicial Process</u>**

As noted, section 12A:9-609(b)(1) permits a secured creditor to take possession of its collateral after default "pursuant to judicial process." AVS argues that it is not required to seek judicial intervention. That is correct; nothing in the UCC requires a party to seek judicial intervention before proceeding to a collateral sale. However, such a requirement would not need to be stated because section 9-610 expressly requires that all aspects of a disposition of collateral be commercially reasonable. When UCC sections 9-609 and 9-610 are read in tandem, it becomes clear that a non-judicial sale is permitted only when it can be conducted in a commercially reasonable manner and without breaching the peace.[20] The natural corollary to that is that if a secured party cannot conduct a commercially reasonable sale without breaching the peace, it will need to seek whatever judicial intervention necessary to conduct a commercially reasonable sale. There is no doubt in this case that AVS could not take possession of the Collateral or provide for its inspection or removal without breaching the peace. Therefore, litigation was necessary and appropriate to conduct a commercially reasonable sale in these circumstances.

AVS argues that by "requiring judicial intervention whenever a debtor deliberately refuses to cooperate would abrogate entirely the express, non-judicial remedy available under

---

[20] Section 9-609(b)(2) provides that after default a secured party may take possession of collateral "without judicial process, if it proceeds without breach of the peace." N.J.S.A. § 12A:9-609(b)(2).

Article 9." *AVS brief* at 25. That is simply not true. Many UCC sales are publicly and privately conducted on a regular basis without any litigation at all, provided that the sale can be conducted without breaching the peace and/or with a debtor's cooperation (or non-involvement). On the flip side, allowing an otherwise commercially ***unreasonable*** auction sale to be conducted simply because the debtor does not cooperate would abrogate entirely the UCC's requirement that every aspect of a sale be commercially reasonable. More germanely, the UCC expressly contemplates that "judicial process" may be necessary. It was here and AVS did not utilize it.

In sum, AVS had many legal options available to it that it chose to forego. Those options included a summary proceeding for replevin, which AVS considered but did not pursue; an Order to Show Cause seeking access and information; and/or a complaint to judicially foreclose on its Collateral. As previously noted, had AVS sought judicial intervention to obtain the information and access it needed, and/or asked the Court to supervise the Sale itself, AVS would likely have been entitled to the *BFP* protection it sought from the beginning of this case. *See* N.J.S.A. § 12A:9-627(c)(1) ("A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved: (1) in a judicial proceeding."). Its failure to do so here contributed to the commercial unreasonableness of the Sale.

**2) <u>Bidding Procedures</u>**

**a. <u>Bidding cap</u>**

Another factor that the Court finds contributed to the commercial unreasonableness of the Sale is the bidding procedure that capped bids at twenty times the 5% deposit tendered pre-auction. The only party that knew the amounts of those deposits and caps (other than the auctioneer) was AVS. The only two parties that bid other than AVS stopped at their pre-auction caps. *See* J-32. AVS won the bidding at $2.55 million, $50,000 above the bidding cap for the next

highest bidder. *Id*. And although AVS argues that the auctioneer could have amended the bidding procedures to allow bids in excess of the cap, there is no evidence that happened. *Id*. Thus, AVS knew its $2.55 million would top the last bidder who could go no higher.[21] The Court believes this term could and actually did "chill" the bidding process and also provided AVS with an unfair advantage, which also contributed to the commercial unreasonableness of the Sale.

**b. Lack of lien information**

AVS did not provide potential bidders with the amount of liens on the Collateral, nor did it advise potential bidders that they were taking subject to those liens. If AVS had gone the judicial route, it could have accessed that information and been assured that all interested parties – lien holders and bidders alike – were properly and accurately notified. AVS cites *Quest Sys., LLC v. Far*, 2023 WL 1806213 (Fla. 2d DCA Feb. 8, 2023) for the proposition that a buyer at a foreclosure sale has the burden to conduct its own due diligence to determine if there are any senior liens. The Court does not find that case persuasive for several reasons. First, that case is not binding on this Court. Second, and more importantly, it is readily distinguishable because that case involved a judicial foreclosure rather than a UCC sale. In this case, no court was involved in the Sale process and a different standard applies, *i.e.*, every aspect of the sale must be commercially reasonable. Also, in this Sale the potential bidders were left to their own devices not only to determine the condition and existence of the Collateral, but also the amount of any liens, whether the Sale was to be subject to liens or free and clear, or how they could retrieve any Collateral they acquired. These are additional defects that cumulatively made the Sale commercially unreasonable.

---

[21] As noted, the potential bidder, NEP/Bonnano, who made a $200,000 deposit enabling a maximum bid of $4 million, chose not to participate at the Auction Sale.

**c. Lot vs. Bulk**

There was a significant amount of confusion over whether the Collateral was being offered in lots **and then** in bulk or just in bulk, even though the Bidding Procedures expressly stated that the Collateral would be offered in bulk, and then in lots. *See* J-26 at ¶ 7. There was no confusion, however, as to: (i) whether it would be preferable to offer to sell this type of collateral in lots – AVS's own counsel,[22] valuation expert,[23] and auctioneer[24] testified it would – and (ii) whether it was offered in lots – it was not. *See* T5 at 49:4-50:10. This also contributed to the unreasonableness of the Sale and could have been avoided with judicial intervention.

**d. Access to Collateral for Removal**

AVS's auctioneer responded to questions from interested parties about access to the Collateral post-auction by repeatedly saying that AVS does not control the Debtor so it had no information about whether TAG or TAG's landlord would permit a successful bidder to pick up the equipment. *See* T2 at 10:9-15 ("[A]s we notified all the potential bidders, the equipment in the inventory is still in the possession of the debtors here . . . and anybody bidding on the collateral would have the obligation of securing possession of it. It's not something that we can guarantee."); T2 at 10:23-24; 11:6-10 ("[A]nybody who is a successful bidder and takes title to the inventory equipment would then have the obligation of tracking it down and obtaining possession with whatever legal means you have available to you"); T6 at 126:10-11 (Bidder question No. 4: "How does the winner take possession of the property?" Finn response: "It will be your responsibility to contact the debtor to arrange."); T6 at 140:24–25 (same); T6 at 141:19 20 (same). Inarguably, the lack of assurance that a winning bidder can actually obtain the

[22] *See* T2 at 62:15-23.
[23] *See* T4 at 118:16-18.
[24] *See* T6 at 112:11-23.

equipment it successfully bid on may adversely impact bidding. The Court believes that is exactly what happened here.

**3) <u>“As Is” Terms Do Not Make the Sale Commercially Reasonable</u>**

AVS takes the position that it was acceptable for it to proceed with a “blind” auction simply because it informed potential bidders that it had no control over TAG and that therefore the sale was “as is” and AVS could make no guarantees as to the existence, condition or location of the Collateral, or as to its removal. *See, e.g.*, *Transcript of June 8 hearing*[25] (“T7”) at 113:12-16 (restating Finn’s statement at the November 19 auction: “I would like to make it clear to everybody in attendance that the secured party does not control the debtor, that we do not have a current inventory list and that we can't guarantee that the successful bidder here today will have access to retrieve the equipment.”); T2 at 106: 9-12 (“again, we have no further information to provide and we do not control the debtor. The bidder can contact the debtors, as we have provided contact information in terms of sale and the VD.”); T1 at 183:11-22 (same); *see also* J-28 (November 13, 2024 Auction Transcript) at 4:9-5:3. AVS washing its hands of providing vital information about the Sale is not the legal equivalent of conducting a commercially reasonable sale.

Finally, even if a “blind” sale may be an acceptable standard in some industries (AVS’s counsel suggested that storage facilities might be an example),[26] AVS presented no evidence that a blind sale is standard in the audio-visual equipment industry. In fact, the opposite was established. Both its auction expert, Mr. Caspert, and its auctioneer, Mr. Finn, testified that in

---

[25] Dkt No. 33

[26] *Transcript of August 4 hearing* at 105:4-23 [Dkt. No. 45]

their many decades of experience, including literally thousands of sales of similar equipment, they had never conducted a similar auction. *See* T5 at 57:1-5; T6 at 71:15-20.

### E. TAG is Not Prevented from Challenging the Sale Based On Its Failure to Cooperate

AVS asserts that TAG should be equitably estopped or, alternatively, prevented by the unclean hands doctrine from challenging the Sale based on conditions it created. AVS maintains that at every step TAG impeded AVS's effort to obtain the information necessary to market the Collateral more comprehensively so it cannot now invoke the lack of information to argue that the Sale process was not commercially reasonable. As noted, the record in this case indisputably establishes TAG's non-cooperation with the Sale. However, none of the cases AVS relies upon for its equitable estoppel and unclean hands arguments arose in the context of a UCC sale. Perhaps that it because the UCC itself provides a remedy in such circumstances – seek judicial intervention. *See* N.J.S.A. § 12A:9-609(b)(1). The Court declines the invitation to apply these equitable doctrines to allow AVS to sidestep its duty under Article 9 to ensure its disposition of Collateral is commercially reasonable in all aspects. *Drobnak v. Andersen Corp.*, 561 F.3d 778, 787 (8th Cir. 2009) ("Equitable remedies are available only when no adequate legal remedy exists."). This determination does not, however, mean that the Court will not consider TAG's conduct when evaluating available remedies or damages, including (without limitation) whether and how much interest and attorney fees AVS may be entitled to recover.

**Conclusion**

The Court finds that the Sale was not commercially reasonable and is therefore void, of no force or effect, and did not transfer title to the Collateral to AVS. TAG is granted a directed verdict on that issue. The Court will enter an Order in accordance with this Opinion.

DATED: October 15, 2026

Vincent F. Papalia
Honorable Vincent F. Papalia
United States Bankruptcy Judge